# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ROGER SILK,

     *Plaintiff*,

v.

                            Case No. 24-cv-0625-ABA

BARON BOND, *et al.*,

     *Defendants*

## MEMORANDUM OPINION

Frank Bond was a successful businessman who died in 2020. During his life, he engaged Plaintiff Roger Silk to provide certain financial planning advice. This case arises because Silk contends that Frank (as the Court will refer to him herein, as his son, Baron Bond, is a party) promised that, insofar as the financial strategies that Silk suggested resulted in tax savings for Frank and/or his estate, Silk would be paid an "incentive fee" after Frank's death. After Frank's death, the personal representatives of Frank's estate took the position that Silk was not owed any "incentive fees" because the contracts he was relying on were never executed, are unenforceable, or did not end up resulting in tax savings. Silk has sued those personal representatives (Defendants Baron Bond and Howard Miller). Both sides have filed motions for summary judgment, and Silk has also filed a motion for sanctions for alleged discovery violations. For the reasons that follow, Defendants' motion for summary judgment will be granted in part and denied in part, Silk's motion for summary judgment will be denied, and Silk's motion for sanctions will be denied.

1

I.      BACKGROUND[1]

Frank Bond's business successes included building a multi-state health and fitness chain from 1959 to 1988 and various real estate investments. ECF No. 1 ¶¶ 2, 14–15. Plaintiff Silk is an economist and Chartered Financial Analyst (CFA) who provided Frank with tax and estate planning advice at various times beginning in or around 1991. *Id.* ¶¶ 2–4, 17–18. Silk alleges that he and Frank entered into various oral and/or written agreements whereby Silk would be entitled to payments upon Frank's death. *Id.* ¶¶ 19–31. Frank died on July 26, 2020; Frank's estate has not paid Silk what he contends he is owed. *Id.* ¶¶ 29, 32; ECF No. 99-1 at 3.

A.      Procedural history

This case has wended its way through four courts thus far. Silk initially filed a claim in the Orphans' Court for Baltimore County requesting a payment of $3.1 million. ECF No. 1 ¶ 32, ECF No. 1-3. The personal representatives of Frank's estate (Defendants here) disallowed that claim. ECF No. 1 ¶ 32, ECF No. 1-3. Silk then sued; he lives in California and originally filed his lawsuit in the Central District of California. ECF No. 1. Silk's complaint asserts three counts for breach of contract and two alternative counts for unjust enrichment and promissory estoppel. ECF No. 1 ¶¶ 33–62.

The district court in California dismissed the complaint for lack of subject matter jurisdiction. *Silk v. Bond*, Case No. 21-cv-3977-ODW (JPRx), 2021 WL 4974041 (C.D. Cal. Oct. 26, 2021). It held that it lacked subject matter jurisdiction based on the

---

[1] Upon consideration of a motion for summary judgment, the Court must consider the facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021).

probate exception to federal jurisdiction, which "'reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate.'" *Id*. at *2 (quoting *Marshall v. Marshall*, 547 U.S. 293, 311–12 (2006)). Silk appealed, and the Ninth Circuit reversed. *Silk v. Bond*, 65 F.4th 445 (2023), *cert. denied, Bond v. Silk,* 144 S. Ct. 91 (2023). The Ninth Circuit held that where the question before the court is "whether a money judgment needs to come from an estate" rather than "whether a case requires a court to annul or probate a will, administer an estate, or assume in rem jurisdiction over property within the custody of a state probate court," the probate exception does not apply to preclude federal subject matter jurisdiction. *Id*. at 455–56. The Ninth Circuit further held that Silk had made out a prima facie case for personal jurisdiction under California's long-arm statute. *Id*. at 456–59. Thus, it remanded the case back to the district court. *Id*. at 459.

Defendants then moved to transfer the case to the District of Maryland pursuant to 28 U.S.C. § 1404(a). ECF No. 53. The Central District of California granted transfer, concluding that the convenience of the witnesses, familiarity with governing law, cost of litigation, and compulsory process factors favored transfer to the United States District Court for the District of Maryland, where the case could originally have been brought. *Silk v. Bond*, Case No. 21-cv-3977-ODW (JPRx), 2024 WL 869469 (C.D. Cal. Feb. 29, 2024).

Following transfer, the parties proceeded to discovery. A number of discovery disputes have arisen. Some of them are reflected in an earlier memorandum opinion issued by this Court. *Silk v. Bond*, Case No. 24-cv-00625-ABA, 2025 WL 1940355 (D. Md. July 15, 2025). After completing discovery, each side has filed motions for

3

summary judgment. ECF Nos. 99 & 105. In addition, Silk has requested that the Court impose discovery-related sanctions on Defendants, in the form of default judgment. ECF No. 113. The specific issues raised in each motion are discussed below.

## B.    The Annuity

Plaintiff Silk alleges that between 1991 and 1995, he and Frank had agreed that Silk's compensation would include a fixed annual salary of $75,000, "an additional annual non-refundable draw against bonus of $25,000," and an incentive fee of 15% of Frank's and his entities' income-tax savings, annuity-tax savings, and savings that his estate would realize after his death. ECF No. 1 ¶¶ 18–19. Silk alleges that this agreement was codified in a written contract. ECF No. 105-1 at 17 (citing ECF No. 106-5 at 2–3). The alleged written contract is in the form of a letter dated December 4, 1990, from Silk to Frank on Silk's letterhead. ECF No. 106-5 at 2–3. No one signed the purported letter agreement; there is no signature under "Sincerely" and a line marked with "Accepted" and "Date" is also blank. *Id*. That document purports to provide for an incentive fee of "10% of tax savings," or as elsewhere described in that document, "10% of the value of each year's tax savings resulting from [Silk's] efforts." *Id*. at 2. It further explains that "[t]ax savings will be calculated as the difference between the tax actually accrued (such as income tax, capital gains tax, estate tax, etc.) and the tax that would have accrued without [Silk's] efforts to reduce taxes." *Id*. Silk contends that this December 4, 1990, alleged contract was later orally amended to increase the incentive fee from 10% to 15%. ECF No. 105-1 at 17 (citing ECF No. 106-3, Deposition of Howard Miller ("Miller Dep.") 210:14–24, 211:22–212:22).

The December 4, 1990 letter does not refer to any particular transactions or strategies that Silk had proposed or that he contended would reduce Frank's or his future estate's tax liabilities. Silk contends, however, that one strategy that he advised Frank to adopt, and that Frank did adopt, was to purchase a "private variable annuity." ECF No. 1 ¶ 20. Silk contends that "[f]rom approximately 1991 through 1993, [he] devoted substantial time and effort to developing, negotiating, and implementing a private variable annuity for Bond." *Id.* Frank invested $25 million in the private annuity in 1994, an amount that grew to more than $50 million by 2020. ECF No. 105-1 at 8 (citing ECF No. 106-4, Expert Report of Michael A. Fahlman, May 28, 2025 ("Fahlman May Expert Report") ¶ 45; ECF No. 106-3, Miller Dep. 92:18–19). Although it is unclear how much greater that investment return was than the rate of inflation, Silk contends that the primary benefit of structuring the investment the way he suggested was that the growth was "tax-free." ECF No. 105-1 at 8. Silk contends that based on the December 4, 1990, letter agreement, which he contends Frank orally accepted and orally modified, Frank's estate owes him 15% of what Silk contends constitute the taxes saved by using a private variable annuity (as opposed to the taxes Frank would have owed if the annuity growth were subject to income taxes). ECF No. 106-4, Fahlman May Expert Report at 32–36. Silk's proffered damages expert calculated Silk's incentive fee based on the annuity to be $637,791. *Id.* ¶¶ 43–47.

### C.    The North Point Agreement

Silk alleges that he also provided Frank with tax planning advice relating to Frank's interest in North Point Shopping Center Limited Partnership ("North Point" or "N.P." or "NPSC"). ECF No. 1 ¶ 25. In 1998, Silk had advised Frank to transfer his

interest in North Point to a Grantor Retained Interest Trust ("GRIT"), an irrevocable trust to which the grantor (the person transferring the assets into the GRIT) retains the right to receive all the net income from the asset for a fixed term (referred to as "Investment NP"). *Id*.; ECF No. 1-1 at 2. On June 28, 1999, Frank and Silk entered into a written agreement (the "North Point Agreement"), which detailed how Silk's fee was to be calculated. ECF No. 1-1 at 2–3. Unlike the December 1990 letter agreement, both parties signed the North Point Agreement. *Id*. at 3.

The North Point Agreement states that any incentive fee to Silk relating to North Point would only become payable upon Frank's death. *Id*. at 2. Step One of the calculation to determine Silk's fee requires "[c]omput[ing] the fair market value as of [Frank's date of death] of the partnership interests of Investment NP owned by the GRIT on January 1, 1999 and any successors to said partnership interests." *Id*. The North Point Agreement further provides that "[t]o the extent that all necessary information to complete the computation is unavailable, the accountants preparing the incentive fee calculation shall have the right to make reasonable and fair assumptions to arrive at the results intended by us; namely, an incentive fee to [Silk] of fifteen percent of [Frank's] estate taxes saved by the Investment NP transaction." *Id*. at 3.

Frank initially transferred his interest in North Point into the GRIT; however, in 2011, Frank purchased his interest back and therefore it was subject to taxation. ECF No. 112-6; ECF No. 116 at 10–11.

The parties dispute how to apply the calculation described in the North Point Agreement. Silk contends that the fee calculation is based on fair market value of the North Point interest owned by the GRIT on January 1, 1999 irrespective of how much

was owned by the GRIT at the time of Frank's death. ECF No. 116 at 11–12. Based on that interpretation of the methodology, Silk's proffered damages expert calculated a fee owed to Silk of $1,771,850. ECF No. 105-1 at 19 (citing ECF No. 106-4, Fahlman May Expert Report ¶¶ 21–34).

Defendants contend the North Point Agreement has a different meaning: that the calculation of the fair market value of the interest at the time of Frank's death was zero given that there was no interest still in the GRIT and that the purpose of the agreement was to award Silk a fee for taxes actually saved, which did not occur here given that Frank ended up paying more in estate taxes. ECF No. 112 at 12–13. Applying that interpretation of the methodology, Defendants' proffered expert calculates that Silk's fee is $0 based on the fact that North Point had been transferred out of the GRIT almost a decade prior to Frank's death, and "[t]he date-of-death value of Investment NP, therefore, is zero." ECF No. 106-18, Expert Report of Raymond J. Peroutka, Jr. CPA/ABV/CFF, Esq., ("Peroutka Expert Report") ¶¶ 2–31. Defendants' second proffered expert explained that not only did Frank purchase back his interest in North Point in 2011 for $1,240,000, but he then liquidated the interest such that there was no appreciation in value and estate taxes were not saved by the North Point investment upon Frank's death. ECF No. 106-19, Expert Report of Allan J. Gibber, Esq. ("Gibber Expert Report") at 8–9.

### D.    The Apartments Investments

Silk alleges that he also provided Frank with tax advice regarding the transfer of interests related to three apartment buildings (Westcliffe Associates Limited Partnership, Warwick Apartments Limited Partnership, and Harbond Associates

Limited Partnership) out of the GRIT that Frank had previously put them into, a strategy upon which Silk contends he was to receive an incentive fee upon Frank's death. ECF No. 1 ¶ 27; ECF No. 112-7 at 1. Silk asserts that the contract attached to the complaint dated August 11, 1999 is the operative agreement between Silk and Frank as to this transaction. ECF No. 105-1 at 20–21 (citing ECF No. 1-2 at 2–3).

Defendants, however, assert that the agreement attached to the complaint was superseded by a subsequent agreement on October 6, 1999. ECF No. 99-1 at 17–18 (citing ECF Nos. 99-5, 99-6).[2] The superseding agreement (the "October Apartments Agreement") and the original agreement are similar except for the fact that the Warwick apartment was removed from the later version. *Id.* Under the October Apartments Agreement (ECF No. 99-6), Silk is entitled to an incentive fee upon Frank's death of 15% of "Tax Savings," defined as "the amount of tax saved as a result of avoiding capital gains tax on the sale of the Westcliffe and Harbond properties because of the stepped-up basis which the partnerships will receive in your estate that they would not have received had they been transferred to Baron and Brandon at the conclusion of the GRIT." ECF No. 99-6 at 1. It further provides that "[t]o the extent that all necessary information to complete the computation is unavailable, the accountants preparing the incentive fee calculation shall have the right to make reasonable and fair assumptions to arrive at the results intended by us; namely, an incentive to [Silk] of fifteen percent of [Frank's or Frank's] estate's income taxes saved by the . . . transactions." *Id.* at 2. Finally, Defendants assert that, in any event, only Westcliffe and

---

[2] The date appears on the top of the second page of the subsequent agreement, ECF No. 99-6 at 2 ("Frank Bond, 10/06/99, Page 2").

Harbond were transferred into, or later out of, the GRIT and, therefore, are the only assets that should be considered under either agreement. ECF No. 112 at 19; ECF No 112-8.

Like with the other alleged agreements, the parties dispute the meaning and operation of the agreements related to the apartment building investments. Silk contends that Frank's estate owes Silk 15% of any *capital gains* taxes that ended up being saved due to the strategy of transferring the GRIT's partnership interests in the apartment buildings to Frank in exchange for limited partnership units—even if the strategy did not end up decreasing the overall taxes paid by Frank or his estate. ECF No. 105-1 at 21; ECF No. 106-20, Expert Rebuttal Report of Michael A. Fahlman, June 26, 2025 ("Fahlman June Expert Rebuttal Report") ¶¶ 25–28, 36–38. Applying that interpretation, Silk's expert calculated a fee owed to Silk of $847,447 for Harbond, $935,401 for Warwick (if included), and $934,387 for Westcliffe. ECF No. 106-4, Fahlman May Expert Report ¶¶ 35–42.

Defendants contend the apartment agreements apply, if at all, to Westcliffe and Harbond only and even then, only if the strategy ended up reducing the *total* taxes that were paid by Frank's estate. ECF No. 106-18, Peroutka Expert Report ¶ 34. Under this interpretation, as Defendants' experts explain, Silk would not be entitled to any incentive fees as none of the apartment investment strategies ended up realizing any *estate* tax savings given that the advice provided by Silk was contingent upon Frank's wife, Shelda, surviving Frank, but she died three years before he did. *Id*. ¶¶ 32–37; ECF No. 106-19, Gibber Expert Report at 9–10.

### E.    Communications regarding the contracts

Shelda, Frank's wife, died in 2017. ECF No. 106-18, Peroutka Expert Report ¶ 35; ECF No. 106-19, Gibber Expert Report at 10; ECF No. 106-20, Fahlman June Expert Rebuttal Report ¶ 29. Shortly after her death, on May 17, 2017, Silk sent a letter to Defendant Miller, Frank's attorney, stating that Shelda's "passing throws into stark relief the limited state of Frank's estate planning. . . . [I]f he were to die now, his estate would face massive estate taxes." ECF No. 128. Silk further explained that "[u]nder the terms of [his] long-standing arrangement with Frank and his affiliated entities, under which [Silk] earn[s] 15% of taxes actually saved, [Silk] would like to suggest that [they] begin in earnest to look at, and hopefully implement, a plan that can eliminate estate taxes on Frank's estate when he dies." *Id*. Defendants contend this confirms that Silk understood that he would only be entitled to any incentive fees if his financial strategies ended up reducing estate taxes after Frank's death.

Defendant Miller, who as noted above is an attorney at Saul Ewing, LLP who represented Frank for many years and is one of the personal representatives of the estate (along with Baron Bond), has on multiple occasions acknowledged that Frank and Silk had incentive fee agreements, including in an internal memorandum with the subject "Incentive Fees Due Roger Silk" from September 7, 2018 that discusses Westcliffe, Harbond, and North Point. ECF No. 106-16 at 2–4. On February 22, 2019, Miller sent Silk an email stating, "[t]wice in the past, you have earned a 15% fee for an estate tax savings idea that was put into place by Frank when the idea was accepted." ECF No. 106-6 at 2. And on October 1, 2020, after Frank's death, Miller sent an email to Rose A. Lambert, CPA with the subject "Fees due Roger Silk...." in which he provides

fair market values and ownership percentages for Westcliffe, Harbond, and North Point for Lambert to calculate "the incentive fees due Roger Silk." ECF No. 106-17 at 2. Finally, in another internal email with the subject "GRIT/Roger Silk" dated November 12, 2020, Defendant Miller outlined key dates and events related to the GRIT, mentioning North Point, Westcliffe, and Harbond, and stated, "Roger Silk planned all of the transactions except for the creation of the GRIT." ECF No. 106-14 at 2. Defendant Bond also acknowledged the existence of agreements between Silk and Frank in an email dated August 5, 2020, in which he states, "Please let me know if you have ANY trouble getting your fees from [Miller] in a timely manner." ECF No. 106-8 at 2 (emphasis in original).

### F. Discovery Dispute

In August 2023, Plaintiff Silk served document requests on Defendants seeking, among other documents, all communications concerning Silk and his demand for payments and all documents and communication concerning Silk's contracts and the calculation of his fees. ECF No. 113-1 at 3 (citing ECF No. 94-2). In December 2024, Defendants certified that their production of documents was complete. *Id.* On February 5, 2025, during Defendant Miller's deposition, he referred to having taken "notes" regarding various calculations, ECF No. 93-3, Miller Dep. 101:21–102:25, and an "Apartment Analysis of Loan" document, ECF No. 94-4, Miller Dep. 166:6–168:19, that had not been produced. ECF No. 113-1 at 3. When Plaintiff's counsel requested the "Apartment Analysis of Loan" document from Defendants' counsel, Plaintiff was told that the document had not been found. ECF No. 94-4, Miller Dep. 167:13–24.

Shortly thereafter, Defendants produced a number of documents, including the documents entitled "Incentive Fees Due Roger Silk" and "Fees due Roger Silk." *Id*. at 4 (citing ECF Nos. 106-16, 106-17). Defendants contend that these documents were protected by the attorney-client privilege and/or the attorney work-product doctrine, but because the documents had been produced (inadvertently) two years earlier in a state proceeding, Defendants were not going to insist on enforcing any privilege or work product protection or otherwise seek to claw back the documents. ECF No. 114 at 3. In May 2025, Defendants produced more documents, including one entitled "Apartment Analysis of Loan." ECF No. 113-1 at 4 (citing ECF No. 94-6 at 32). On May 6, 2025, during Defendant Miller's second deposition, when he was asked if he had had a chance to re-review his notes, he responded, "I didn't find any notes as to when – what meeting, what date, when it was exactly when we decided we didn't – I just know I had meetings, I looked at my calendar. I didn't find anything in the file." ECF No. 93-5, Miller Dep. 500:8–25. As Defendants had not produced these "notes," Plaintiff filed a motion to compel production. ECF No. 113-1 at 4 (citing ECF No. 92-1 at 14). On July 15, 2025, the Court denied Plaintiff's motion to compel production, stating that "[o]n the present record the Court has no reason to believe Defendants have failed to produce or log responsive communications." ECF No. 95 at 2 n.2.

On July 29, 2025, during the deposition of Allan Gibber, one of Defendants' proffered experts, he described certain documents that had been provided to him and upon which he was relying but that had not been provided to Plaintiff. ECF No. 113-1 at 4. When Plaintiff's counsel asked Mr. Gibber for copies of the documents he was referring to, Mr. Gibber emailed Plaintiff's counsel the November 2020 internal email

from Defendant Miller with the subject "GRIT/Roger Silk" and Defendant Miller's handwritten notes calculating fees for Silk. *Id.* at 4–5 (citing ECF No. 106-14 at 2–5). Plaintiff contends that these documents were not produced to Plaintiff, were not listed in Defendants' privilege logs, and were not identified on Mr. Gibber's "List of Documents Reviewed." *Id.* at 5 (citing ECF Nos. 92-9, 92-10, 113-4). Based on this, Plaintiff filed a motion for sanctions in the form of striking Defendants' answer and granting default judgment in favor of Plaintiff. ECF No. 113.

## II.  STANDARD OF REVIEW

### A.  Default Judgment as a Sanction

If a party does not obey a discovery order while an action is pending, fails to provide information as required by Rule 26(a) or (e), or fails to serve answers to interrogatories or appear for deposition, the court may take a number of actions, including "rendering a default judgment against the disobedient party" or ordering the party to "pay the reasonable expenses, including attorney's fees, caused by the failure." Fed. R. Civ. P. 37(b)(2)(A)(vi); Fed. R. Civ. P. 37(c)(1)(C); Fed. R. Civ. P. 37(d)(1)(A)(ii); Fed. R. Civ. P. 37(d)(3). In moving for default judgment as a sanction, "[t]he motion must include a certification that the movant has in good faith conferred or attempted to confer" with the noncomplying party. Fed. R. Civ. P. 37(a)(1).

A district court has "wide discretion to impose sanctions for a party's failure to comply with its discovery orders." *Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs., Inc.*, 872 F.2d 88, 92 (4th Cir. 1989). But a district court's discretion is narrower concerning a sanction of default judgment. *Id.* (citing *Wilson v. Volkswagen of Am., Inc.*, 561 F.2d 494, 503–04 (4th Cir. 1977), *cert. denied*, 434 U.S. 1020 (1978)). The

court must balance its interest in enforcing discovery orders and the party's interests in "trial by jury and a fair day in court." *Id.* (citing *Wilson*, 561 F.2d at 503–04). Because this sanction is so severe, courts do not use this sanction to rule on the merits when a party has only "general[ly] misbehav[ed]," but instead reserve it for the most "flagrant case[s]," where the compliant party's rights may be affected or where the noncomplying party acts with "callous disregard" of its professional obligations. *Wilson*, 561 F.2d at 504; *see Nat'l Hockey League v. Metro. Hockey Club Inc.*, 427 U.S. 639, 643 (1976)).

### B.      Motion for Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party meets its burden when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case" and when the nonmovant bears "the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the non-moving party fails to confront the motion with "sufficient evidence . . . for a jury to return a verdict for that party," the movant is entitled to summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 323 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Matsushita*, 475 U.S. at 587 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). In making this determination, the Court views all facts, and all reasonable inferences drawn from those facts, in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88.

## III.    DISCUSSION

### A.    Plaintiff is not entitled to default judgment or any other sanction

The Court begins with Silk's motion for sanctions. Whether Plaintiff is entitled to default judgment as a sanction depends on a four-part test: "(1) whether the noncomplying party acted in bad faith; (2) the amount of prejudice [the] noncompliance caused [the] adversary, which necessarily includes an inquiry into the materiality of the evidence he failed to produce; (3) the need for deterrence of the particular sort of noncompliance; and (4) the effectiveness of less drastic sanctions." *Mut. Fed. Sav. & Loan Ass'n*, 872 F.2d at 92; *accord, Marsh v. Bottoms Up Gentlemen's Club, LLC*, Case No. 23-cv-1157-EA, 2025 WL 744067, at *2 (D. Md. Mar. 7, 2025); *see Wilson,* 561 F.2d at 503–04. Generally, a court should provide an "explicit and clear" warning to a noncomplying party before issuing a sanction of default. *Marsh*, 2025 WL 744067, at *2 (citing *Malhotra v. KCI Techs., Inc.*, 240 F. App'x 588, 590 (4th Cir. 2007); *Hathcock v. Navistar Int'l Transp. Corp.*, 53 F.3d 36, 40 (4th Cir. 1995); *Mey v. Phillips*, 71 F.4th 203, 218 (4th Cir. 2023)).

> Before exercising its inherent power to dismiss a case based on the wrongdoing of a party in the judicial process, 'a court must consider the following factors: (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest.'

*Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 373–74 (4th Cir. 2013) (quoting *United States v. Shaffer Equip. Co.,* 11 F.3d 450, 462–63 (4th Cir. 1993)).

Silk is not entitled to default judgment as a sanction. Plaintiff has not shown that Defendants were acting in bad faith or were intentionally withholding discoverable documents, or that Defendants have failed to comply with a specific court order. Also, the documents alleged to have been withheld were documents created by Frank's attorney and would likely have been protected from disclosure by the attorney-client privilege and/or work product doctrine if they had not been disclosed in prior litigation or to the proffered expert witness. Thus, Plaintiff cannot be prejudiced by a delay in production of documents that Defendants were not required to produce in the first place. To the extent that any prejudice has resulted to Plaintiff, it does not rise to the level of justifying sanctions on Defendants and certainly not to the extent of default judgment as a sanction. Therefore, the Court will deny Silk's motion for sanctions and turn to the merits of his claims.

### B.      Motions for Summary Judgment

#### 1.      Application of Maryland's dead man's statute

Under Maryland law, when a party sues the personal representative or estate of a deceased person, that party "may not testify concerning any transaction with or statement made by the dead . . . person." Md. Code Ann., Cts. & Jud. Proc. § 9-116. The sole exceptions are if that party is "called to testify by the opposite party" or if "the testimony of the dead . . . person has been given already in evidence in the same proceeding concerning the same transaction or statement." *Id*. This is known as a "dead man's statute." "The statute was intended to prevent one party to a transaction from

16

testifying to the acts and declarations of a decedent whose acts are under consideration in a proceeding to which the witness is a party, to enforce obligations arising from such transactions." *Schifanelli v. Wallace*, 271 Md. 177, 184 (1974) (quoting *Est. of Soothcage v. King*, 227 Md. 142, 150 (1961)) (internal quotations omitted). California, where this case was originally filed before it was transferred here, has abolished its dead man's statute. *See* Cal. Code Civ. P. § 1880(3), *repealed by*, 1965 Cal. Stat. 299 §§ 62–64 (1967) & 1980 Cal. Stat. 676 § 72. Hence there arises a threshold question with a potentially significant impact on the disposition of the claims in this case: Which state's law governs the question of whether Silk may testify about his alleged "transaction[s]" with Frank or about Frank's "statements," Maryland law (which would prohibit such testimony) or California law (which does not contain any such prohibition)?

This is a question of state law as incorporated into federal law, given that Federal Rule of Evidence 601 directs federal courts that, "in a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 601; *see also Berk v. Choy*, 607 U.S. --, 146 S. Ct. 546, 552–53 (2026) (explaining that under the *Erie* doctrine, a federal court sitting in diversity applies state substantive law and federal procedural law but "[i]f a Federal Rule answers the disputed question," the "court bypasses *Erie*'s inquiry altogether" and the Rule "governs, unless it 'exceeds statutory authorization or Congress's rulemaking power'"); *Moreno v. Bosholm*, 151 F.4th 543, 560–61 (4th Cir. 2025) ("FRE 601 addresses how to determine the competency of *every* witness testifying in federal court") (emphasis in original). The legislative history of Rule 601 confirms that the drafters understood the rule to encompass the applicability and terms of state dead man's statutes. H.R. Rep.

17

No. 93–650 (1973) (Comm. on the Judiciary) ("[W]here such statutes have been enacted they represent State policy which should not be overturned in the absence of a compelling federal interest."). Thus, unlike the other common law competency exceptions that were displaced by Rule 601 that focused on "mental or moral qualifications for testifying" (e.g., spouses and people with certain religious beliefs), dead man's statutes, like the one in Maryland, "represent State policy which should not be overturned in the absence of a compelling federal interest." Fed. R. Evid. 601, advisory committee notes.

The parties agree that either Maryland or California law governs the question of the admissibility of Silk's testimony. *See, e.g.*, ECF No. 105-1 at 14–16 (Silk); ECF No. 99-1 at 11–15 (Defendants). But they dispute which state's law governs. Defendants argue that Maryland law (including its dead man's statute) applies while Silk argues that California law (including its lack of a dead man's statute) applies. Silk offers three arguments as to why Maryland law should not apply. None of them persuades this Court to depart from the analysis set forth below, which this Court considers clear and binding under Rule 601 and the Supreme Court cases described.

First, Silk argues that Defendants have already conceded that Maryland's dead man's statute does not apply to this case in their briefing before the Ninth Circuit. ECF No. 105-1 at 14 (citing ECF No. 106-10 at 50 ("[U]nder Fed. R. Evis. 601, Maryland's Dead Man's Act would be inoperative in any trial before the" California federal court.)). Given that Defendants concede that, because this case was transferred pursuant to 28 U.S.C. § 1404(a), this Court must apply the same law the transferor court would have

applied, Silk argues that if Maryland's dead man's statute would have been inoperable there, as conceded by Defendants, it would be inoperable here. *Id.* at 14–15.

Second, Silk argues that the dead man's statute is procedural rather than substantive and, under California's choice of law rules, California's procedural rules would apply. *Id.* at 15. Silk points first to a case by the Ninth Circuit in which it determined that Washington's dead man's statute was procedural as well as two cases in which courts stated, without deciding, that Maryland's dead man's statute may be procedural in nature. ECF No. 105-1 at 15 & n.2 (citing *Equitable Life Assur. Soc. of U.S. v. McKay,* 861 F.2d 221, 223 (9th Cir. 1988) ("evidentiary statutes, such as the Washington Deadman's Statute, are procedural rather than substantive"); *Zadnik v. Ambinder*, 258 Md. App. 1, 14 n.11, 15 (2023) (noting that the admissibility of evidence is generally a procedural issue, but holding that neither state's dead man's statute applies to wrongful death actions); *Maltas v. Maltas*, 197 F. Supp. 2d 409, 425 (D. Md. 2002), *rev'd on other grounds*, 65 F. App'x 917 (4th Cir. 2003) (not deciding whether Maryland's dead man's statute was procedural or substantive, but noting a possibility that the Maryland Court of Appeals would find it to be procedural)). Given that none of these cases actually held the statute to be procedural and the Federal Rule answers the question, the Court need not address these statements upon which those courts did not rely in their holdings.

Third, Silk argues that "even if the Dead Man's Statute were deemed substantive . . . , Defendants have not met their burden to establish that Maryland substantive law applies to Count One, which involves a fee for services Silk provided while he was living in California." *Zadnik*, 258 Md. App. at 15 n.2.

As for Defendants' counsel's statements before a different court, this Court must apply the governing law, not a party's interpretation of law. *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."); *Grove City Coll. v. Bell*, 465 U.S. 555, 562 n. 10 (1984), *superseded by statute on other grounds* (a party's "concession [on a point of law], of course, is not binding on [the court]"). Therefore, the Court will independently analyze the legal question before it rather than rely on party statements in prior briefs.

With this case having been transferred from the Central District of California under 28 U.S.C. § 1404(a), this Court must apply the substantive law that the transferor court would have applied. *Ferens v. John Deere Co.*, 494 U.S. 516, 519 (1990) (superseded by statute on other grounds) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 642 (1964)). Because federal subject matter jurisdiction in this case is based on diversity of citizenship, the California federal court would have applied California's choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941).

For breach of contract claims, California's choice-of-law rules provide that "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." Cal. Civ. Code § 1646. California courts have traditionally considered the place where a contract is made to be the "state that the last act necessary to the contract, the acceptance, was performed." *Ury v. Jewelers Acceptance Corp.*, 227 Cal. App. 2d 11, 16 (1964) (citing *Michelin Tire Co. v. Coleman &*

*Bentel Co.,* 179 Cal. 598, 604 (1919)); *see Prudential Ins. Co. v. Heyn,* 139 F. Supp. 602, 609 (S.D. Cal. 1956) (citation omitted) ("The general rule of law is that the place of contracting is the place where the last event necessary to make a contract occurs."). Here, it is undisputed that all the alleged agreements related to this case were drafted and proposed by Silk and that Frank was the last person to sign any written agreements or assent to any oral agreements; therefore, Frank's action would constitute the last act necessary for any contract to have been made. *See* ECF No. 99-1 at 8. Frank undisputedly was domiciled in Maryland for the entirety of the relevant time and there is no evidence that Frank was in any other state at the time of acceptance of any contract. *Id.* Accordingly, under California's choice-of-law rules, Maryland substantive law would apply to any contracts at issue in this case.

As Rule 601 explicitly directs the Court to look to state law for the applicability of dead man's statutes and federal courts sitting in diversity look to state substantive law, it is clear that the dead man's statute is a substantive rather than procedural law. As Maryland substantive law governs this dispute under California's choice-of-law rules, Maryland's dead man's statute also applies. As noted above, the statute states that

> [a] party to a proceeding by or against a personal representative . . . as such, in which a judgment or decree may be rendered for or against them, . . . may not testify concerning any transaction with or statement made by the dead . . . person, personally or through an agent since dead, unless called to testify by the opposite party, or unless the testimony of the dead . . . person has been given already in evidence in the same proceeding concerning the same transaction or statement.

Md. Code Ann., Cts. & Jud. Proc. § 9-116. The test "for determining what is a 'transaction' within the meaning of the statute [i]s: 'Whether, in case the witness testify falsely, the deceased, if living, could contradict it of his own knowledge.'" *Schifanelli*, 271 Md. at 184 (quoting *Ridgley v. Beatty*, 222 Md. 76, 83 (1960)); *see also Boyd v. Bowen*, 145 Md. App. 635, 662 (2002); *Midler v. Shapiro*, 33 Md. App. 264, 279 (1976). Thus, to the extent Silk's testimony relates to transactions alleged to have been entered into with Frank, Maryland's dead man's statute would bar that testimony at trial, and thus the Court may not consider it in deciding whether Silk has generated a genuine dispute of material fact that would preclude summary judgment in Defendants' favor.

### 2.    Breach of Contract (Counts 1–3)

Silk's primary claim is that Frank entered enforceable contracts that obligated his estate to pay Silk an incentive fee of 15% of the tax savings resulting from the three financial strategies that Silk advocated for Frank to use that are discussed above: the private variable annuity (Count 1), the transfer of Frank's interests in the North Point Shopping Center into a GRIT (Count 2), and transfer of Frank's interest in the two (or three) apartment buildings out of the GRIT (Count 3). The Court will first lay out the applicable legal standards and then turn to each of those claims in turn.

### a)    Legal standards

A breach of contract claim requires proof "that 'the defendant owed [the plaintiff] a contractual obligation and that the defendant breached that obligation.'" *Level Heating & Air Conditioning Co. v. Patriot Constr., LLC*, Case No. 20-cv-3154-DLB, 2021 WL 5804297, at *4 (D. Md. Dec. 7, 2021) (quoting *Taylor v. NationsBanks, N.A.*, 365 Md. 166, 175 (2001)); *see Great W. Life & Annuity Ins. Co. v. Info. Sys. & Networks*

*Corp.*, Case No. 03-cv-951-AW, 2007 WL 9747366, at *3 (D. Md. 2007), *aff'd*, 523 F.3d 266 (4th Cir. 2008). Maryland applies an objective interpretation of contracts. *Level Heating & Air Conditioning*, 2021 WL 5804297, at *4 (citing *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 166 (2003)).

"If a contract is unambiguous, the court must give effect to its plain meaning and not contemplate what the parties may have subjectively intended by certain terms at the time of formation." *Nova Rsch., Inc. v. Penske Truck Leasing Co.,* 405 Md. 435, 448 (2008) (citing *Diamond Point v. Wells Fargo,* 400 Md. 718, 751 (2007)). "If the contract is ambiguous, the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract." *Sy-Lene of Wash.,* 376 Md. at 167–68 (quoting *Cnty. Comm'rs of Charles Cnty. v. St. Charles Assoc. LP*, 366 Md. 426, 445 (2001)) (internal quotations omitted). "A contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Nova Rsch., Inc.,* 405 Md. at 448 (citing *Diamond Point*, 400 Md. at 751). "In interpreting a contract provision, we look to the entire language of the agreement, not merely a portion thereof." *Id.* (citing *Jones v. Hubbard,* 356 Md. 513, 534–35 (1999)); *see Level Heating & Air Conditioning*, 2021 WL 5804297, at *4 (citing *Harig v. Progress Rail Servs. Corp.*, 166 F. Supp. 3d 542, 549 (D. Md. 2015)).

### b)    The Annuity (Count 1)

Defendants contend that Count 1 is based on an alleged oral agreement "in or around 1991" in which Frank allegedly agreed to "pay Silk an agreed-upon incentive fee of 15% of [Frank]'s and his entities' income-tax savings, annuity-tax savings, and savings that his estate would realize after his death in exchange for Silk's services.'" ECF No. 99-

1 at 15 (quoting ECF No. 1 ¶ 34). They further argue that because Maryland's dead man's statute bars Silk's testimony about that alleged oral agreement, and because there is no other evidence of such an *oral* agreement, they are entitled to summary judgment on Count 1. *Id.* at 17.

Silk contends that even if the dead man's statute applies such that he cannot testify to the existence of an oral agreement, Count 1 is not based solely on an *oral* agreement. ECF No. 105-1 at 17. He contends a factfinder could find that he is entitled to an incentive fee due to tax savings from the annuity based on (1) the December 1990 letter (ECF No. 106-5), which he describes as "a *written contract* in which Frank Bond expressly agreed to pay Silk an incentive fee, including for income tax, capital gains tax, and estate tax savings," and (2) "acknowledge[ments]" by "Defendants themselves . . . , in their own sworn testimony and in writing, [of] Frank Bond's agreement to pay Silk a 15% fee." ECF No. 105-1 at 17 (citing ECF Nos. 106-5, 106-6; ECF No. 106-3, Miller Dep. 210:14–212:22). He goes further to argue that not only does that evidence preclude granting Defendants summary judgment on Count 1, but that the Court should grant *him* summary judgment on Count 1 because the undisputed evidence establishes that there was an agreement between Frank and Silk, that the agreement was later modified to increase the fee percentage from 10 to 15 percent, the agreement was never terminated, and Silk performed under the agreement and was never paid. *Id.* at 13–14.

In response, Defendants argue that the 1990 letter that Silk alleges is the contract for Count 1 is unsigned, the only potential evidence of Frank's assent and modification would be Silk's testimony, and the portions of Defendant Miller's deposition testimony in which he discussed an incentive fee were related to the calculations for the North

24

Point Agreement and the October Apartments Agreement, not for the unsigned December 1990 letter. ECF No. 112 at 10–11.

Both parties' motions for summary judgment will be denied as to Count 1 as there are genuine disputes regarding material facts such that neither side has shown an entitlement to judgment as a matter of law.

Starting with Plaintiff's motion, as previously stated, Silk's testimony regarding transactions alleged to have been entered into with Frank are barred by the dead man's statute, and, therefore, he cannot testify to Frank's alleged assent to the unsigned contract or any alleged modifications to the terms. The December 1990 letter as written falls far short of entitling Silk to summary judgment because not only does it say nothing about an annuity, but is not signed by either Silk or Frank. Silk points to the February 22, 2019 email from Defendant Miller to Silk, in which Defendant Miller wrote that "**[t]wice in the past**, you have earned a 15% fee" but it does not state which two times Defendant Miller was referring to. ECF No. 106-6 at 2 (emphasis added); *see* ECF No. 105-1 at 17. Thus, whether Defendant Miller was referring only to the North Point Agreement and October Apartments Agreement, or to the annuity and one of the other agreements, is a factual dispute that cannot be resolved at summary judgment. Finally, Defendant Bond's August 2020 email regarding Silk receiving his fees from Frank's estate in a timely manner, ECF No. 106-8 at 2, makes no reference to any specific agreements to which Defendant Bond has personal knowledge, and thus also does not constitute evidence that would entitle Silk to summary judgment. For these reasons, Silk's motion for summary judgment on Count 1 will be denied.

Defendants are also not entitled to summary judgment on Count 1. They are correct that the December 1990 letter is unexecuted and does not refer to an annuity, and that Silk's core theory under Count 1 is that an oral agreement existed but Silk may not testify about such an oral agreement. ECF No. 112 at 10. In the absence of an executed contract and/or such testimony, Silk likely will be unable to prove that an enforceable contract exists for an incentive fee based on the annuity. But Silk has pointed to sufficient other evidence to survive summary judgment on Count 1. Defendant Miller's February 22, 2019 email, ECF No. 106-6, is ambiguous, but a reasonable factfinder could conclude that it constituted an acknowledgement of some incentive fee obligation with respect to the annuity. Similarly, Defendant Bond's August 5, 2020 email, ECF No. 106-8, is also unspecific, but it arguably recognizes that some agreement existed between Frank and Silk. Defendants' emails are evidence Silk arguably could rely on to prove, even without his own testimony, that Frank did agree to the terms of the December 1990 letter agreement, that it applied to the annuity, and that the incentive fee increased to 15%. Further, during Defendant Miller's testimony, he was provided with a copy of the December 1990 letter and testified that it was the agreement that he was referring to earlier in his testimony when he was talking about calculations, which, drawing inferences in Silk's favor, may indicate that his emails were referring to Silk being owed fees under the December 1990 letter for the annuity. ECF No. 116-2, Miller Dep. 368:16–369:13.

In short, there is sufficient evidence (other than Silk's testimony, which will be excluded at trial) from which a reasonable factfinder could find either that Frank did agree that his estate would pay an incentive fee based on tax savings from the annuity

strategy or that he did not agree. Accordingly, there are genuine disputes regarding material facts and both motions for summary judgment on Count 1 will be denied.[3]

### c)   The North Point Agreement (Count 2)

Unlike with respect to Count 1, it is undisputed that Frank and Silk both executed the written contract that forms the basis for Count 2, under which Frank agreed that an "incentive fee . . . of fifteen percent of . . . estate taxes saved" by the "tax planning completed in 1998" involving the North Point Shopping Center Limited Partnership was payable to Silk, and that such "incentive fee" would be "payable upon [Frank's] death." ECF No. 1-1 at 2–3. It is also undisputed that Silk provided Frank with the estate and tax planning advice explained in the agreement, and that, at least for some portion of time, Frank followed Silk's advice and had transferred his interest in North Point into a GRIT. ECF No. 1 ¶¶ 25–26; ECF No. 1-1; ECF No. 47 ¶¶ 25–26; ECF No. 106-14. The dispute with respect to Count 2 instead relates to whether Silk is owed any fee under the North Point Agreement in light of the fact that, in 2011, Frank undisputedly reversed the transaction by moving the North Point asset out of the GRIT (and back into his estate). ECF No. 112-6.[4] The record does not reveal the reasoning for Frank's decision to reverse the transaction. See ECF No. 116 at 11. But, it is undisputed

---

[3] Defendants also argue that Silk is not entitled to summary judgment as he has not offered any evidence of "how the annuity effectively 'saved' Frank from paying any taxes (a condition precedent to payment)." ECF No. 112 at 9. Because the Court concludes that neither party is entitled to summary judgment based on there being genuine disputes of material facts, the Court need not and will not rule on that issue.

[4] Although Silk contends "that Bond's *purported* 2011 transfer has a 'concerning lack of documentation,'" there is no evidence that this transfer did not occur, and the 2011 tax return shows the interest back in Frank's possession. ECF No. 116 at 11 n.5 (emphasis added).

that ultimately Frank did not follow Silk's advice—and thus the strategy did not end up resulting in any tax savings. But Silk's theory is that even in the absence of any actual tax savings, Silk is entitled to an incentive fee based on the *hypothetical* tax savings that would have resulted if Frank *had* continued to follow Silk's advice, *i.e.*, if he had left the North Point asset in the GRIT. *Id.* at 11–12.

"Step 1" for calculating any incentive fee under the North Point Agreement is to "[c]ompute the fair market value as of the Calculation Date [the date of Frank's death, July 28, 2020] of Investment NP owned by the GRIT on January 1, 1999." ECF No. 1-1 at 2. Silk contends this means the value of the asset as of January 1, 1999 irrespective of whether the interest was still "owned by the GRIT" at the time of Frank's death. ECF No. 105-1 at 19; ECF No. 116 at 10–13. He argues that "the express terms of the North Point Agreement did *not* give [Frank] the ability to evade Silk's fee by unilaterally transferring his interest out of the GRIT at a later date." ECF No. 116 at 11. Silk argues that this is further shown by Defendants' acknowledgement of fees owed under the North Point Agreement in various communications after the 2011 sale. ECF No. 105-1 at 18 (citing ECF Nos. 106-16 & 106-17); ECF No. 116 at 12.

Defendants argue that they are entitled to summary judgment on this claim because Silk's incentive fee under the North Point Agreement was contingent upon "tax savings related to Silk's advice regarding North Point" and because it is undisputed that

no such savings were ever "realized." ECF No. 112 at 12.[5] They contend that, although Frank initially heeded Silk's advice in 1999 and transferred the North Point interest into the GRIT, he later decided to repurchase the North Point interest in 2011 and thus it became a part of his taxable estate; therefore, there were no tax savings from which Silk can derive an incentive fee. *Id.* at 12–13. In other words, they argue, even assuming the North Point Agreement is enforceable, and even if Step One of the agreement required looking to the interest owned by the GRIT on January 1, 1999, the sale and liquidation of the asset by the time of Frank's death means that the interest had a zero value on the calculation date and thus Silk's incentive fee is $0. *Id.* at 13. Finally, Defendants contend that Silk knew that his fee was contingent, and "[h]e could have drafted a contract that addressed the variety of intervening circumstances that could jeopardize the fee" but "Silk made no provision for any changed circumstances." *Id.* at 14.

The plain language of Step One of the North Point Agreement does not specify whether the calculation of the fair market value of the North Point interest on the date of Frank's death was contingent upon whether the interest was still owned by the GRIT on that date. Further, the agreement is also ambiguous as to whether the fair market calculation was intended to be calculated based on the *actual* value of the interest at the time of Frank's death ($0) or based on a standard future value calculation based on the

---

[5] In Defendants' motion for partial summary judgment, they do not mention an argument for entitlement to summary judgment as to Count 2. ECF No. 99. However, in their response/reply brief, they argue that they are entitled to summary judgment. ECF No. 112 at 12. During the motions hearing, Defendants confirmed that they intended their motion for summary judgment to encompass Count 2.

date of the previously owned interest (i.e., what the interest previously in the GRIT would have been worth had it still been in the GRIT at the time of Frank's death). In interpreting a provision, the Court looks to the entirety of the contract. The second-to-last paragraph of the North Point Agreement specifically provides that if there are any issues with completing the computation according to the steps laid out in the contract, Silk would still be owed 15 percent of "estate taxes saved by the [North Point] transaction." ECF No. 1-1 at 3. Therefore, it is clear from the express language of the North Point Agreement that the parties' intent was for Silk's incentive fee to be contingent upon *actual* estate taxes saved. Given that it is undisputed that the estate saved no taxes on the North Point interest, Silk's incentive fee under the agreement is $0.

Silk seeks to avoid that result by pointing to emails written by Defendant Miller on November 12, 2020 in which he stated, "Roger Silk planned all of the transactions except for the creation of the GRIT" when referring to the creation of the North Point interest and other key dates regarding the GRIT. ECF No. 106-14 at 2. In another email and memorandum, Silk argues, Miller acknowledged that the estate owed an incentive fee under the North Point Agreement. ECF No. 106-16 at 2–4 (mentioning the North Point interest in a 2018 memorandum with the subject "Incentive Fees Due Roger Silk"); ECF No. 106-17 at 2 (requesting an accountant to compute the incentive fee due to Silk including for North Point (referred to as NPSC)). But Miller's emails cannot create a contractual obligation not stated in the contract. Reading the North Point Agreement as a whole, it is clear that Silk would have been entitled to an incentive fee had Frank continued to accept Silk's advice and kept the North Point interest in the

GRIT. Nothing in the North Point Agreement prevented Frank from deciding later that he no longer wanted to follow that advice, and nothing in the contract entitled Silk to a contingent fee based on hypothetical (as opposed to actual) tax savings. Therefore, Silk's motion for summary judgment as to Count 2 will be denied and Defendants' motion for summary judgment as to Count 2 will be granted.

### d)    The Apartments Investments (Count 3)

As noted above, Frank invested in real estate, including apartment buildings: Westcliffe, Harbond, and Warwick. Silk and Frank negotiated an incentive fee based on those investments; that much is clear. The principal questions arising under Count 3 are: (1) whether the agreement encompasses only Westcliffe and Harbond, or also Warwick, and (2) whether either party is entitled to summary judgment as to an incentive fee based on Silk's advice with respect to those investments.

Starting with the Warwick issue, there are two versions in the record of an agreement between Silk and Frank about incentive fees based on the apartments investments. The first, dated August 11, 1999, refers to all three properties (Westcliffe, Warwick, and Harbond), and includes a table calculating incentive fees for all three properties as of that date. ECF No. 1-2. The second, dated October 6, 1999 (on the second page; the parties did not revise the date on the first page), removes any reference to Warwick and refers only to Westcliffe and Harbond. ECF No. 99-6.

"[W]here the parties intend the new agreement itself to constitute a substitute for the prior claim, then this substituted contract immediately discharges the original claim . . . [and] recovery may only be had upon the substituted contract." *Clark v. Elza*, 286 Md. 208, 214 (1979). "A claim under an earlier contract will be governed by a later

agreement if the latter operates to supersede to rescind the former. Where not expressly stated, the legal effect of the later contract on the former must be gathered from a four-corners' examination of the contractual instrument in question." *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 328 (2003) (Raker & Harrell, JJ., dissenting) (quoting *Allstate Ins. Co. v. Stinebaugh*, 374 Md. 631, 646 (2003)) (internal quotations omitted).

Applying that standard here, the October 6, 1999 version of the agreement unambiguously reflects an intent by the parties to supersede the August 11 version. It is undisputed that the October 6 agreement came after the August 11 version. The August 11 version had all the same language with the exception of the Warwick apartment, and both were witnessed by Miller. Indeed, the only version signed by Silk was the later one. *Compare* ECF No. 1-2 at 3 *with* ECF No. 99-6 at 2.

Silk's only argument to the contrary is that in drafting the revised agreement Defendant Miller requested that Silk add language that "[t]his letter shall super[s]ede all prior agreements relating to the subject matter," ECF No. 99-5, but the revised agreement (ECF No. 99-6) did not include such language. ECF No. 105-1 at 22–23. But the absence of such language expressly stating that the October Apartments Agreement supersedes the August 11 version is unnecessary, because the fact that the parties re-signed an agreement with substantially the same information within two months of each other and that Warwick was never put into the GRIT establishes that the parties intended for the subsequent agreement to supersede the prior one. *See Cargill, Inc. v. WDS, Inc.*, Case No. 16-cv-848-FDW-DSC, 2018 WL 1525352, at *3 (W.D.N.C. Mar. 28, 2018); *Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*, 474 N.Y.S.2d 122, 125

(N.Y. 1984). Accordingly, the October 6, 1999 version is the operative agreement upon which Silk can make a claim. *See* ECF No. 99-6. Given that the October Apartments Agreement excludes any mention of the Warwick apartment, Defendants' motion for summary judgment as to Silk's claim for an incentive fee based on the Warwick investment will be granted.[6]

That leaves the question of whether either party is entitled to summary judgment on Silk's claim for an incentive fee based on alleged tax savings from the strategy of removing the Westcliffe and Harbond assets out of the GRIT.

Defendants do not argue that they are entitled to summary judgment on Count 3 based on the evidence but rather lodge a procedural argument. They point out that when Silk filed his complaint, he relied solely on the August 11 version of the contract—the one that, as discussed above, has no legal effect because it was superseded by the October 6 version. ECF No. 1 ¶¶ 28, 51–53 & ECF No. 1-2. Silk did not expressly *allege* in the alternative, in the complaint, that at minimum he was owed an incentive fee as to Westcliffe and Harbond under the October Apartments Agreement. Defendants contend that this failure to expressly allege an entitlement to an incentive fee under the superseding agreement means he may not now pursue a claim under the correct, operative agreement. ECF No. 99-1 at 17–19. The Court disagrees. Given the congruence in language between August 11 version (as alleged in the complaint) and the operative October Apartments Agreement—with the sole difference being the exclusion

---

[6] Silk's motion for summary judgment did not seek summary judgment as to Warwick but instead requested partial summary judgment as to the Westcliffe and Harbond apartments. ECF No. 105-1 at 20–21.

of Warwick from the superseding version—Defendants were sufficiently on notice of the terms of the alleged agreement for Defendants to lodge a defense to Count 3. Indeed, Defendants have proffered an expert report calculating the taxes saved under the agreement. Accordingly, summary judgment will not be granted based on Plaintiff's failure to attach the controlling version of the contract to the complaint. But the Court will interpret Count 3 going forward as a claim for a breach of the October Apartments Agreement (ECF No. 99-6).

That leaves Silk's motion on Count 3 as to Westcliffe and Harbond. He argues that because there is no dispute that "Westcliffe and Harbond are included within the Apartments Agreement" and because the only evidence in the record calculating an incentive fee under that agreement is Plaintiff's proffered expert ($943,387 for Westcliffe and $847,447 for Harbond), the Court should grant him summary judgment as to those incentive fees. ECF No. 105-1 at 20–21. Defendants argue that there is at minimum a genuine dispute of fact regarding whether Silk is entitled to any incentive fee under the October Apartments Agreement. This dispute turns on whether the parties intended the incentive fee to be calculated based on 15% of the *estate taxes* that ended up being saved by the GRIT strategy described in the Apartments Agreement (this is Defendants' position as stated at the February 17, 2026 hearing) or instead based on 15% of *capital gains* taxes that were saved even if the strategy did not end up diminishing the overall tax liability for Frank's estate (Silk's position, *see* ECF No. 105-1 at 21 (citing ECF No. 106-4, Fahlman May Expert Report ¶ 42 & Schedule 2)).

This dispute matters because Defendants have proffered evidence, through their expert, Raymond Peroutka, that the GRIT strategy did not end up reducing taxes that

were owed at the time of Frank's death because Frank's wife, Shelda, pre-deceased him. *See* ECF No. 106-18, Peroutka Expert Report ¶¶ 34–37. As Mr. Peroutka explains, if Frank had predeceased his wife—as apparently the parties expected or at least assumed would happen—there "may" very well have been net tax savings. *Id.* ¶ 34. But Mr. Peroutka further explains that because Shelda died in 2017 and Frank's estate was subject to estate tax (including tax assessed on the Westcliffe and Harbond interests)— and because the effective estate tax rate in Maryland in 2020 was 50% and the effective capital gains tax rate was 33%—the strategy reflected in the October Apartments Agreement ended up *increasing* the taxes due after Frank's death. *Id.* ¶ 35 (citing 26 U.S.C. § 2033) & ¶ 37.

The October Apartments Agreement provides that Silk is entitled to a fee of "fifteen percent (15%) of Tax Savings," which is defined as "the amount of tax saved as a result of avoiding capital gains tax on the sale of the Westcliffe and Harbond properties." ECF No. 99-6 at 1. Silk contends this means he would be owed a fee based on any capital gains tax avoided even if there were no actual tax savings for the estate. ECF No. 116 at 13; *see* ECF No. 106-4, Fahlman May Expert Report ¶¶ 37, 42; ECF No. 106-20, Fahlman June Expert Rebuttal Report ¶¶ 25–28, 36–38. During the February 17, 2026 hearing, Defendants argued that the parties intended the definition of "Tax Savings" to be limited to taxes actually saved by the estate upon Frank's death. To support this contention, Defendants contend that the 1990 letter on which Silk bases Count 1, to the extent it is valid, demonstrates Silk and Frank's intent that "Tax Savings" means "the difference between the tax actually accrued (such as income tax, capital gains tax, estate tax, etc.) and the tax that would have accrued without [Silk's]

effort to reduce taxes." ECF No. 106-5 at 2. They further argue that Silk's letter to Defendant Miller after Frank's wife's death stating that Silk would "earn 15% of taxes **actually saved**" shows his understanding that "Tax Savings" would be determined based on actual taxes saved as a whole rather than just any capital gains tax deduction. ECF No. 128 (emphasis added). Additionally, the framing of the definition of "Tax Savings" as "the amount of tax saved as a result of avoiding capital gains tax" could lead a reasonable factfinder to conclude that the first "tax" means "estate tax saved" given that inferring it to mean "capital gains tax saved" would make the definition repetitive and circular (i.e., the amount of capital gains tax saved as a result of avoiding capital gains tax). *See* ECF No. 99-6 at 1.

This creates ambiguity regarding whether the parties intended "tax saved" to mean the total taxes actually saved at the time of Frank's death or just the amount of capital gains taxes saved that would have been possible based on Silk's advice had Shelda not pre-deceased Frank. Given this ambiguity, there is a genuine dispute of fact that materially affects whether Silk is entitled to any payment under the October Apartments Agreement. Therefore, both parties' motions for summary judgment will be denied as to the Westcliffe and Harbond apartments.

### 3. Unjust Enrichment (Count 4) & Promissory Estoppel (Count 5)

A claim of unjust enrichment requires evidence to support three elements: "1. A benefit conferred upon the defendant by the plaintiff; 2. An appreciation or knowledge by the defendant of the benefit; and 3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Cnty. Comm'rs of Caroline Cnty. v.*

*J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 95 n.7 (2000) (quoting *Everhart v. Miles*, 47 Md. App. 131, 136 (1980)). A claim of promissory estoppel requires evidence to satisfy a four-part test: "1. a clear and definite promise; 2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; 3. which does induce actual and reasonable action or forbearance by the promisee; and 4. causes a detriment which can only be avoided by the enforcement of the promise." *Pavel Enters., Inc. v. A.S. Johnson Co., Inc.*, 342 Md. 143, 166 & n.29 (1996) (citing Restatement (Second) of Contracts § 90(1) (1981)); *Union Tr. Co. of Md. v. Charter Med. Corp.,* 663 F. Supp. 175, 178 n. 4 (D. Md. 1986), *aff'd w/o opinion,* 823 F.2d 548 (4th Cir. 1987)).

Claims for unjust enrichment and promissory estoppel are untenable where an express contract exists as both are claims based on quasi-contracts. *See Cnty. Comm'rs of Caroline Cnty.*, 358 Md. at 96 (quoting *Mass Transit Admin. v. Granite Contr. Co.,* 57 Md. App. 766, 776 (1984)) ("The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests."). But plaintiffs may assert unjust enrichment and promissory estoppel claims as alternatives to a breach-of-contract claim should the evidence eventually reveal that there was no express contract. *See* Fed. R. Civ. P. 8(d)(2*); Swedish Civ. Aviation Admin. v. Project Mgmt. Enters., Inc.,* 190 F. Supp. 2d 785, 792 (D. Md. 2002) (holding that quasi-contract remedies may be asserted in the alternative to a contract claim concerning the same subject matter). Regardless as to whether the quasi-contract claims are pled in the alternative, they are still subject to the summary judgment standard and, therefore, summary judgment should be granted

where there is no genuine dispute of material facts and, even viewing the evidence in the light most favorable to the plaintiff, the defendant is entitled to judgment as a matter of law. *See Cnty. Comm'rs of Caroline Cnty.*, 358 Md. at 92–93 (citations omitted).

As the unjust enrichment and promissory estoppel claims are pled in the alternative, given that Maryland's dead man's statute bars any testimony by Silk as to transactions alleged to have been entered into with Frank, Silk has not presented sufficient evidence to make out a *prima facie* case for unjust enrichment or promissory estoppel or to show that there is any genuine issue of material facts. Without Silk's testimony, he is unable to prove Frank's "appreciation and knowledge" of any benefit in order to establish a claim for unjust enrichment or to prove that Frank made a "clear and definite promise" or that he had "a reasonable expectation that [any] offer [would have] induce[d] action" by Silk in order to establish a claim for promissory estoppel. *See id.* at 95 n.7; *Pavel Enters., Inc.*, 342 Md. at 166. Therefore, regardless of whether Silk might end up being unable to prove an entitlement to relief under any express contract, Defendants are entitled to summary judgment on Counts 4 and 5.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 99) will be granted in part and denied in part, Plaintiff's motion for summary judgment (ECF No. 105) will be denied, and Plaintiff's motion for sanctions (ECF No. 113) will be denied. A separate order follows.

Date:  March 31, 2026

_____**/s/**_____
Adam B. Abelson
United States District Judge